**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| **GORGI TALEVSKI, by his Next Friend Ivanka Talevski,** | ) |
| **Plaintiff,** | ) |
| **v.** | ) **CASE NO. 2:19-cv-00013-JTM-APR** |
| **HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, AMERICAN SENIOR COMMUNITIES, LLC, and VALPARAISO CARE AND REHABILITATION,** | ) |
| **Defendants.** | ) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Defendant Health and Hospital Corporation of Marion County ("HHC")[1] moves to dismiss Gorgi Talevski ("Talevski")'s Complaint for three reasons: (1) the Federal Nursing Home Reform Act ("FNHRA") does not create a private right of action for Talevski to prosecute HHC's FNHRA violations; (2) Talevski failed to file his Complaint within the applicable two-year statute of limitations, thus rendering his claims as time barred; and (3) Defendant American Senior

---

[1] In its brief, HSC argues

> Although the Plaintiff incorrectly filed his Complaint against Health and Hospital Corporation of Marion County and Valparaiso Care and Rehabilitation as two separate entities, Valparaiso Care and Rehabilitation is merely an assumed business name under which Health and Hospital Corporation of Marion County does business. Therefore, for the purposes of this Brief, the Defendants will refer to Health and Hospital Corporation of Marion County and Valparaiso Care and Rehabilitation as a single entity using the term "HHC."

(Defendant's Brief in Support of Motion to Dismiss, p. 1). Talevski's Complaint alleges that Valparaiso Care and Rehabilitation ("VCR") is a separate entity. In a Motion to Dismiss, the Court must accept all-well pleaded factual allegations within the complaint as true. Although VCR's status is not relevant to HHC's motion, for purposes of his response, Talevski will continue to refer to VCR and HHC as separate entities.

Communities ("ASC") cannot be sued pursuant to § 1983 because it is not a state actor that has acted under color of state law.

However, for the reasons set forth in this Response, HHC is incorrect in all three of its assertions.

## I. STATEMENT OF FACTS

With one important exception discussed below, Talevski accepts HHC's recitation of the factual allegations, although Talevski will provide additional facts to provide context and clarification as required.

In one glaring instance, however, such context or clarification are insufficient, because HHC has ***significantly*** distorted the factual allegations in the Compaint.

On page two of its brief, HHC states " In May 2017, after ISDH issued its findings, American Senior contacted Talevski's family to discuss Talevski's return to VCR, but Talevski's family instead decided to keep Talevski at the Bremen nursing home facility permanently. [Filing No. 1 at 5.]" (Dft.'s Br., p. 2).[2]

In fact, however, Talevski alleged in his Complaint, that

> On January 19, 2017, an ISDH Administrative Law Judge ("ALJ") held a nearly six-hour-long hearing following which the ALJ effectively denied VCR's attempt to "patient dump" Mr. Talevski, ruling "the decision to transfer [Mr. Talevski] from Valparaiso Care and Rehabilitation should **NOT** be affirmed." The order was issued February 28, 2017.
>
> Based on the ALJ's order, the family attempted to have Mr. Talevski returned to VCR. However, VCR simply ignored the order and refused to readmit Mr. Talevski.
>
> As a result, Mr. Talevski unnecessarily spent more than a month and a half at NeuroPsych, at a cost of nearly $30,000, all of which was

[2] Citations to "Dft.'s Br., p. X" refer to the correspondingly-numbered page(s) of the *Defendant's Brief in Support of Motion to Dismiss*, Docket # 15.

> paid for by Medicare.
>
> Mr. Talevski's family complained to the ISDH regarding VCR's refusal to abide by the ALJ's order. The ISDH sent in another nurse investigator to address all the complaints against the nursing home.
>
> In May 2017, the ISDH issued their finding in an 81 page document.
>
> After "dumping" Mr. Talevski at NeuroPsych in January, following the May ISDH report, ASC contacted Mrs. Talevski to discuss evaluating Mr. Talevski for return to VCR.
>
> After meeting with VCR staff in June 2017, and after reading the 81 page report, Mr. Talevski's family was very concerned about possible retribution against Mr. Talevski if he was to be returned. Additionally, Mr. Talevski was by now acclimated to his new surrounding at the Bremen nursing home.

(Compl., ¶¶ 26-32).[3]

## II. SUMMARY OF THE ARGUMENT

FNHRA creates a private right of action because: (1) Congress, in passing FNHRA unambiguously intended to create privately enforceable rights; (2) the rights FNHRA created are not vague and amorphous concepts whose enforcement would strain judicial competence; and (3) the provision giving rise to the asserted rights is couched in mandatory, rather than precatory terms.

Talevski's claim is not time-barred because his original cause of action did not accrue on January 9, 2017, but on February 28, 2017. Moreover, Talevski's family attempted to return Talevski to VCR ***after*** the ALJ's February 28, 2017 ruling, and VCR again refused.

Finally, Defendant ASC is liable to suit under § 1983 because it can be considered a "partner" or "joint venturer" with HHC in a profit-making field, and because it is acting on behalf of HHC, furnishing services that HHC itself could provide, and is therefore an agent of HHC.

---

[3] HHC's misstatement of Talevski's actual allegation is so significant, and so misleading, that, were it shown to be intentional, it might be considered dishonesty. Talevski does ***not*** assert that HHC's misstatement was intentional. Talevski's intention is merely to point out the serious nature of the misstatement.

# III. ARGUMENT

## A. LEGAL STANDARD FOR MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM.

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint challenged by a Rule 12(b) Motion to Dismiss is not required to have detailed factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The "court must accept the complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor." *Transit Exp., Inc. v. Ettinger*, 246 F.3d. 1018, 1023 (7th. Cir. 2001).

## B. FNHRA PROVIDES TALEVSKI WITH A PRIVATE RIGHT OF ACTION TO ENFORCE HIS RIGHTS WITH RESPECT TO THE DEFENDANTS.

HHC's primary argument is that FNHRA does not create a private right of action. However, in *Maine v. Thiboutot*, 484 U.S. 1 (1980), the United States Supreme Court held that § 1983 creates a cause of action for violations of any federal statutory ***right*** under the color of state law. *Id.*

According to § 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured in an action at law, suit in equity, or other proceedings for redress[.]

42 U.S.C. § 1983.

Thus, § 1983 is simply a vehicle by which a plaintiff can bring causes of actions against defendants acting "under the color of state law" for deprivation of rights afforded by the Constitution

or other federal laws *Jones v. Wilhelm*, 425 F. 3d. 455, 465 (7th Cir. 2005). As the Supreme Court has stated, § 1983 merely provides a mechanism for enforcing individual rights "secured" elsewhere. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 624 (1979).

Traditionally, two Supreme Court cases have established the standards for determining whether or not a statute has created a right enforceable under § 1983: *Blessing v. Freestone*, 520 U.S. 329 (1997), and *Gonzaga University v. Doe*, 536 U.S. 273 (2002). In *Blessing*, the Court outlined three factors to be considered in determining whether or not a federal stature created a privately enforceable right: (1) Whether Congress unambiguously intended to create a privately enforceable rights; (2) Whether the rights created are vague and amorphous that its enforcement would strain judicial competence; and (3) Whether the provision giving rise to the asserted right is couched in mandatory, rather than precatory terms. *Blessing*, 520 U.S., at 340-41.

The Supreme Court revisited the issue of unambiguously conferred rights in *Gonzaga*. There, the Court clarified *Blessing*'s first factor regarding Congressional intent, holding

> We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action under Sec. 1983. Section 1983 provides a remedy only for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Accordingly, it is rights, not the broader or vaguer "benefits" or "interests" that may be enforced under the authority of that section. This being so, we further reject the notion that our implied right of action cases are separate and distinct from our Sec. 1983 cases. To the contrary, our implied right of action cases should guide the determination of whether a statute confers rights enforceable under Sec.1983.

*Gonzaga*, 536 U.S., at 283.

In order for a statute to create private right, its text must be "phrased in terms of the person benefited." *Cannon v. University of Chicago*, 441 U.S. 677, 692 n. 13 (1979). In *Gonzaga* the Court clearly indicated that an inquiry as to whether a statute creates a private right must begin with

a "determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries." *Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 664 (7th Cir. 2015). This is because there is a rebuttable presumption that rights are enforceable through § 1983 if it has been established that a statute confers an individual right. *Blessing*, 520 U.S., at 341. However, this presumption can be defeated by demonstrating that Congress "specifically foreclosed a remedy under Sec. 1983." *Blessing*, 520 U.S., at 341.

**1. <u>Congress unambiguously intended that FNHRA create privately enforceable rights.</u>**

**a. Congress intended that FNHRA benefit a plaintiff like Talevski.**

*Blessing* first requires that Congress must have intended that the statute in question must benefit the Plaintiff. *Gonzaga* clarifies this first criteria by requiring that the statue unambiguously confer the right to support a cause of action brought under § 1983.

In 1986, The Committee on Nursing Home Regulation of The Institute of Medicine ("IOM") conducted a complex and technically rigourous study of the nation's nursing homes. It submitted a landmark 415 page report to Congress entitled "Improving the Quality of Care in Nursing Homes" (January 1, 1986). Congress quickly adopted the IOM report recommendations and formulated them into the "Federal Nursing Home Reform Act," for the first time creating national standards of care and rights for people living in nursing homes." *See* www.iom.edu/Reports/1986/Improving-the-Quality-of-Care-in-Nursing-Homes/Federal-Nursing-Home-Reform-Act.aspx. These recommendations where clearly for the benefit of nursing home patients.

In *Grammer v. John J. Kane Regional Centers*, 570 F. 3rd 520 (3d. Cir. 2009), the Third Circuit applied the *Blessing/Gonzaga* analysis to FNHRA,[4] and noted that FNHRA "provisions are

[4] As of this writing, the Third is still the only Circuit to apply a *Blessing/Gonzaga* analysis to FNHRA, although the Seventh Circuit, in *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 973 (7th Cir. 2012), applied the analysis to another section of the Medicaid Act, reaching the same conclusion.

obviously intended to benefit Medicaid beneficiaries and nursing home residents, not nursing homes themselves." *Grammer*, 570 F.3d, at 527. *Gonzaga* requires "a statute to contain rights-creating language which clearly imparts an individual entitlement with an 'unmistakable focus on the benefitted class.'" *Grammer*, 570 F. 3d, at 526. "Rights-creating language can be characterized as language that explicitly confers a right directly on a class of persons that include the Plaintiff." *Cannon*, 441 U.S., at 690 n. 13.

*Grammer* notes that "FNHRA [is] directly concerned with 'whether the needs of any particular person have been satisfied.'" *Grammer*, 570 F.3d, at 527. According to *Grammer*

> The FNHRA are replete with rights-creating language. The amendments confer upon residents of such facilities the right to chose their personal attending physician, to be fully informed about and to participate in care and treatment, to be free from physical and metal abuse, to voice grievances and to enjoy privacy and confidentiality. Nursing homes are required to care for residents in a manner promoting quality of life, provide services and activites to maintain the highest practicable physical, mental and psychosocial well-being of residents, and conduct a comprehensive assessment of their functional abilities. Further, the statute specifically guarantees nursing home residents the right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for the purposes of discipline or convenience and not required to treat their medical symptoms.

*Grammer*, 570 F.3d, at 529.

It is clear that the main objective of the FNHRA is to ensure that nursing home residents receive high quality standard of care that will help them achieve the highest practicable quality of life.

FNHRA's legislative history notes that

> Requirements relating to ***residents' rights***.--The Committee amendment would, for purposes of compliance and enforcement, elevate ***residents' rights*** to the same level as staffing and other requirements critical to the quality of care and quality of life of nursing facility residents. Under the amendment, ***residents' rights*** fall

> into five broad categories: (1) ***general rights*** (e.g., freedom of choice of physician, freedom from restraints, privacy, confidentiality, least restrictive environment, grievances, and participation in resident and family groups); (2) ***transfer and discharge rights***; (3) ***access and visitation rights***; (4) ***equal access to quality care***; and (5) ***admissions policy***. ***The overriding purpose of these residents rights requirements is to improve the quality of care and the quality of life for all nursing home facility residents, whether or not eligible for Medicaid***. The Committee expects that they will be strictly observed and vigorously enforced.

H.R. Rep. No. 100-391 (1), at 457-58 (1987). More importantly, with respect to congressional intention, the same report made it clear that private rights of action can be used to enforce FNHRA. "The Committee emphasizes that the remedies specified under the amendment are not exclusive, and should not be construed to limit . . . the remedies available to residents at common law, ***including a private right of action to enforce compliance*** with requirements for nursing facilities." *Id.*

It is difficult to see how Congress's intention could be made any clearer than by ***specifically*** stating that FNHRA establishes a ***Residents' Bill of Rights*** to ensure the ***rights*** of nursing home residents. It is also significant that the FNHRA ***rights*** apply to ***all*** residents of nursing facilities, not just those that receive Medicaid funds.

**b. The rights FNHRA creates are neither vague, nor amorphous, and enforcement of those rights would not strain judicial competence.**

Talevski alleges that HHC abandoned him at a neuropsychiatric hospital an hour and half away from his home, without any warning or notice to his family, and even without his dentures, and refused to allow him to return, despite his being found capable of doing so.[5] Specifically, Talevski alleges that the Defendants deprived Mr. Talevski of his rights under FNHRA by:

a. maintaining a policy, practice or custom of allowing

[5] With respect to the question of whether the rights at issue here are so "vague and amorphous that [their] enforcement would strain judicial competence," it is significant that a state Administrative Law Judge had no difficulty in determining that the Defendants did not follow the proper procedure in removing Talevski and refusing to allow him to return. (Compl., ¶ 26).

the use illegal chemical restraints on Mr. Talevski and other VCF patients;

b. maintaining a policy, practice or custom that denied Mr. Talevski, via his legal representatives, to file grievance free of reprisal as required by law;

c. maintaining a policy, practice or custom that deprived Mr. Talevski and other VCR residents, to remain at the nursing facility and not to be transferred or discharged without due process;

d. denying Mr. Talevski due process by failing to provide proper and timely notification of any transfer or discharge from the nursing facility;

e. by maintaining a policy, practice, or custom, that failed to care for Mr. Talevski in such a manner and in such an environment as to promote maintenance or enhancement of the quality of life of each resident;

f. by maintaining a policy, practice, or custom that failed to provide Mr. Talevski with nursing and related services and specialized rehabilitative services to attain or maintain his highest practicable physical, mental, and psychosocial well-being; that is, by repeatedly and regularly failing to have sufficient staff to care for Mr. Talevski;

g. failing to provide Mr. Talevski with medically-related social services, including but not limited to translation services, to attain or maintain his highest practicable physical, mental, and psychosocial well-being; that is, by failing to provide an effective means to communicate with Mr. Talevski in his native language;

h. failing to provide Mr. Talevski with pharmaceutical services (including procedures that assure the accurate acquiring, receiving, dispensing, and administering of all drugs and biologicals) to meet his needs; that is, by over-prescribing the use of psychotropic drugs as chemical restraints;

i. failing to provide Mr. Talevski with an on-going program, directed by a qualified professional, of

activities designed to meet his interests and the physical, mental, and psychosocial well-being;

j. by failing to provide Mr. Talevski with routine dental services (to the extent covered under the State plan) and emergency dental services to meet his needs; that is, by failing to provide him with his dentures when transferring him to NeuroPsych;

k. depriving Mr. Talevski of his right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat his medical symptoms; that is, by over-prescribing the use of psychotropic drugs to chemically restrain Mr. Talevski.

Maintaining a policy, practice or custom; denying due process by failing to provide proper and timely notification; failing to provide required, medically-related, social services; and depriving Mr. Talevski of his right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints. These are the essence of the rights Talevski seeks to vindicate, and none of these allegations is significantly different from the kinds of issues courts deal with on a daily basis in many other areas of federal law.

Moreover, FNHRA repeatedly uses the phrases "must provide," "must maintain," and "must conduct," all of which make clear that the nursing homes ***must provide*** a basic level of service and care for residents and Medicaid patients, as a matter of right. *Grammer*, 570 F.3d., at 528.

**c. The FNHRA provisions giving rise to Talevski's asserted rights are couched in mandatory, rather than precatory terms.**

As the *Grammer* court found, FNHRA "unambiguously binds the states and the nursing homes as indicted by the repeated use of 'must.'" *Grammer*, 570 F.3d., at 528. Congress is not merely expressing a wish or request, but is granting a concrete set of rights to all nursing home patients. There may be some dispute over the semantics in FNHRA, but it is clear that in enacting

FNHRA Congress clearly mandated that nursing homes must provide certain services, standards, and rights to nursing home patients.

The Defendant's cite a decision from the Southern District of Indiana in support of their contention. Coincidentally, the defendants in that case – *Terry v. Health and Hosp. Corp. of Marion Cnty, et al.*, Case No. 1:10-cv-00607-DML-JMS, slip op. (S.D. Ind., March 29, 2012) – are the same defendants in this case.

In *Terry*, Magistrate Judge Lynch noted that "[n]either the Supreme Court nor the Seventh Circuit has decided whether 'patient rights' under FNHRA are the kind of rights actionable under section 1983." *Terry*, slip. op. at 6. The Judge Lynch goes on to note that

> [t]he only circuit court to reach the issue, the Third Circuit in *Grammer v. John J. Kane Regional Centers-Glen Hazel*, 570 F.3d 520 (3rd Cir. 2009), cert. denied, 130 S.Ct. 1524 (2010), held that violations of a nursing home resident's rights to certain care and treatment under FNHRA are actionable under section 1983.

*Id*. Judge Lynch notes that there has been disagreement among a number of District Courts (none of which are in the Seventh Circuit). *Id*. After a lengthy analysis of *Blessing* and *Gonzaga*, neither of which address FNHRA,[6] Judge Lynch ultimately rejects the reasoning in *Grammer*, and concludes that the Plaintiff in *Terry* did not have a private right of action. *Terry*, slip. op., at 22.

However, for the reasons cited above, and with all due respect to the Southern District of Indiana, this Court should reject *Terry*'s conclusion in favor of the more persuasive analysis and conclusion to this question in *Grammer*.

That *Terry* reached the wrong decision is supported by the decision in *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 973 (7th Cir. 2012). In *Planned Parenthood*, which was decided nearly five months ***after*** *Terry*, the Seventh Circuit addressed the

[6] *Blessing* addressed Title IV-D of the Social Security Act, while *Gonzaga* was a Family Educational Rights and Privacy Act ("FERPA") case. *Terry*, slip. op., at pp. 9, 11.

question of whether the Medicaid Act's "Freedom of Choice" provision, 42 U.S.C.A. § 1396a(a)(23), provided a private right of action enforceable through § 1983. *Planned Parenthood*, 699 F.3d., at 972-77.

The Seventh Circuit noted that "[i]n the context of legislation adopted under the spending power, . . . Congress must clearly express its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds." *Id.*, at 973 (ellipses added). Given the fact that FNHRA, like the "freedom of choice" provision – and indeed all of the Medicaid Act – was adopted under the spending power, *Planned Parenthood* is singularly instructive with respect to this case.

The Court then looked at statutory language that "mandate[d] that all state Medicaid plans provide that any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required[,]" and concluded that the language provided that "Medicaid patients have the ***right*** to receive care from the qualified provider of their choice." *Id.*, at 974 (ellipses in original; alterations and emphasis added).

The FNHRA provides, among other rights, that "[a] nursing facility must protect and promote the rights of each resident, including each of the following rights: "[t]he right to be free from physical or mental abuse, corporal punishment, involuntary seclusion"; "[t]he right to reside and receive services with reasonable accommodation of individual needs and preferences, except where the health or safety of the individual or other residents would be endangered"; "[t]he right to choose a personal attending physician, to be fully informed in advance about care and treatment, to be fully informed in advance of any changes in care or treatment that may affect the resident's well-being, and (except with respect to a resident adjudged incompetent) to participate in planning care and

treatment or changes in care and treatment." 42 U.S.C.A. § 1396r.

If one restates the rights provided in § 1396r, using the language of the "freedom of choice" provision, 42 U.S.C.A. § 1396a, the results are:

- Any resident of a nursing home ***must be afforded the right*** to be free from physical or mental abuse, corporal punishment, involuntary seclusion.
- Any resident of a nursing home ***must be afforded the right*** to reside and receive services with reasonable accommodation of individual needs and preferences, except where the health or safety of the individual or other residents would be endangered.
- Any resident of a nursing home ***must be afforded the right*** to choose a personal attending physician, to be fully informed in advance about care and treatment, to be fully informed in advance of any changes in care or treatment that may affect the resident's well-being, and (except with respect to a resident adjudged incompetent) to participate in planning care and treatment or changes in care and treatment.

It is clear that the Seventh Circuit would find that FNHRA creates a private right of action for Talevski, and this Court should do no less.

**C. TALEVSKI'S ACTION WAS TIMELY FILED *WITHIN* THE TWO-YEAR STATUTE OF LIMITATIONS.**

Since there is no federal statute of limitations for § 1983 actions, federal courts must apply the most appropriate ***state*** statute of limitations. *Lovett v. Seniff*, 277 F. Supp. 2d 896, 897 (N.D. Ind. 2003). In Indiana, that is the two-year statute of limitations for personal injury claims under Ind. Code § 34-11-2-4(a). *Campbell v. Chappelow*, 95 F.3d 576, 580 (7th Cir. 1996).

HHC argues that, because VCR originally refused to allow Talevski to return on January 9, 2017, the two-year statute of limitations expired on January 9, 2019, one day before Talevski filed his suit. (Dft.'s Br., p. 6). According to HHC, "Talevski never returned to VCR for treatment from

HHC and American Senior after he was last transferred to NeuroPsych on December 30, 2016; therefore, the last action that could possibly give rise to Talevksi's claims occurred on January 9, 2017." (*Id.*).

However, 42 C.F.R. § 483.204 requires Indiana to provide a system for a resident of a skilled nursing facility or nursing facility to appeal a notice of intent to discharge or transfer the resident. 42 C.F.R. § 483.204. VCR's January 9, 2017, refusal to readmit Talevski was the first indication Talevski had that he would not be allowed to return to VCR. Thus, in practical effect, VCR's January 9, 2017, action was a ***notice*** that it intended to discharge or transfer Talevski.

Indiana's system for regulating the discharge or transfer of patients requires that, before such an transfer, VCR was required to prepare a "relocation plan to prepare the resident for relocation and to provide continuity of care." 410 Ind. Admin. Code 16.2-3.1-12. Because the Administrative Law Judge determined VCR had ***not*** prepared such a plan, the ALJ denied VCR's request to transfer Talevski. (Compl., ¶ 26). In his Complaint, Talevski alleges that, ***after*** the ALJ's January 19, 2017, hearing, and after the Department of Health issued its final order denying Talevski's forced transfer on March 1, 2017, his family attempted to have him returned to VCR ***again***. (*Id.*, ¶ 27). However, VCR simply ignored the order and refused to readmit Mr. Talevski. (*Id.*). In other words, it was the Department of Health's issuance of the final order denying the transfer on March 1, 2017, and VCR's subsequent refusal to abide by the order, which caused the statute of limitations to begin running.

Even if the Court were to conclude that the statute of limitations originally began to run on January 9, 2017, VCR's refusals to admit Talevski following the ALJ hearing on January 19, 2017, and after the Department's issuance of a final order, on March 1, 2017, restarted the statute each time.

Talevski's claim is not time-barred.

**D. <u>AMERICAN SENIOR COMMUNITIES CAN BE SUED UNDER 42 U.S.C. § 1983.</u>**

HHC's final argument is that ASC is not subject to suit under § 1983 because "it is not a state actor acting under color of state law." (Dft.'s Br., p. 6).

Relying on *Harrison v. Veolia Water Indianapolis, LLC*, 929 N.E.2d 247, 251 (Ind. Ct. App. 2010), HHC argues that "[u]nder Indiana law, private entities may become agents or instrumentalities of the state and subject to the laws and statutes affecting governmental agencies and corporations when such private entities are endowed by the state with powers or functions governmental in nature." (*Id.*, p. 7)(internal quotations omitted). *Harrison*, however, is entirely *inapposite*, in that the issue in that case was whether the Plaintiff was required to send the City a tort claim notice.

In *Harrison*, Veolia argued that while it did not fall under the express statutory definition of a "political subdivision," it nonetheless was sufficiently akin to a governmental entity or political subdivision of the State that it was entitled to ITCA's procedural protections. *Harrison*, 929 N.E.2d, at 250. A major concern for the Court of Appeals was whether a private entity like Veolia should enjoy the protection of the ITCA, the modern incarnation of sovereign immunity. *Id.*, pp. 250-52. The Court of Appeals "conclude[d], after considering the evident purposes of ITCA and the development of the common law predating ITCA's adoption, that Veolia is not a governmental entity or a political subdivision of the State entitled to ITCA's protections." *Id.*, at 252 (alteration added).

The question here is not whether ASC is governmental entity or a political subdivision, but instead, whether ASC's ***actions*** infringing Talevski's federal rights are "fairly attributable to [HHC]?" *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982).

State employment is generally sufficient to render the defendant a state actor. *West v. Atkins*, 487 U.S. 42, 49 (1988). When a private party's action occurred in conjunction with a business in

which the state may be considered a partner or joint venturer in a profit making field, the private party acts under color of state law. *Jackson v. Metro. Edison Co.*, 483 F.2d 754, 757 (3d Cir. 1973), *aff'd*, 419 U.S. 345 (1974). When the State has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity, the private entity acts under color of law. *Johnson v. Cullen*, 925 F. Supp. 244, 251 (D. Del. 1996). It is enough that the private entity is a willful participant in joint activity with the State or its agents. *United States v. Price*, 383 U.S. 787, 794 (1966).

Here, HHC has contracted ASC – and indirectly, ASC's employees – to manage VCR on behalf of HHC, in effect making ASC's employees also employees of HHC, in much the same way as a private labor recruiter and the manufacturer for whom the recruiter provides employees are considered joint employers for purposes of discrimination litigation. Moreover, operating VCR is clearly a profit making venture, given the Medicaid reimbursement rules, and HHC is clearly ASC's partner or joint venturer in that undertaking. HHC has provided the physical facilities ASC manages on HHC's behalf, and HHC is dependant on ASC to manage those facilities profitably for HHC. Finally, it is clear that ASC is a ***willing*** participant in the activity.

Simply put, ASC's actions are clearly such that they are "fairly attributable to [HHC.]" *Rendell-Baker*, 457 U.S., at 838.

## IV. CONCLUSION

For all the foregoing reasons, Defendnant HHC's Motion to Dismiss must be denied, in all respects.

Respectfully submitted,

*s/ Jay Meisenhelder*

Jay Meisenhelder, Atty No. 19996-49
JAY MEISENHELDER EMPLOYMENT
& CIVIL RIGHTS LEGAL SERVICES, P.C.

650 North Girls School Road, Suite D40
Indianapolis, IN 46214
Office Telephone: 317/231-5193
Direct Telephone: 317/899-9220
Facsimile Number: 317/982-5463
Email Address: jaym@ecrls.com

______________________________
Susie Talevski, Atty. No.

## CERTIFICATE OF SERVICE

I certify that on April 29, 2019, the foregoing was filed electronically. Copies will be sent to all counsel of record by operation of the Court's CM/ECF system.

*s/ Jay Meisenhelder*