
CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 20-1664

GORGI TALEVSKI, by next friend IVANKA TALEVSKI,

*Plaintiff-Appellant,*

*v.*

HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:19 CV 13 — **James T. Moody**, *Judge.*

———————————

ARGUED DECEMBER 4, 2020 — DECIDED JULY 27, 2021

———————————

Before KANNE, WOOD, and SCUDDER, *Circuit Judges.*

WOOD, *Circuit Judge.* For Gorgi Talevski, living with dementia went from difficult to worse during his stay at Valparaiso Care and Rehabilitation, a state-run nursing facility near his family home in Indiana. Through his wife, Ivanka Talevski, he sued Valparaiso Care, the Health and Hospital Corporation of Marion County (HHC), and American Senior Communities, LLC (ASC) under 42 U.S.C. § 1983 for

violations of the Federal Nursing Home Reform Act (FNHRA), see 42 U.S.C. § 1396r *et seq.* (We refer to the defendants collectively as Valparaiso Care unless the context requires otherwise.) The district court dismissed the action for failure to state a claim on which relief can be granted, based on its finding that FNHRA does not provide a private right of action that may be redressed under 42 U.S.C. § 1983.

This is a difficult area of law, no doubt, and we appreciate the careful attention that both this district court and several others within our circuit have given to this issue. See *Terry v. Health & Hospital Corporation*, 2012 U.S. Dist. LEXIS 43702 (S.D. Ind. Mar. 29, 2012); *Schwerdtfeger v. Alden Long Grove Rehab. & Health Care Ctr., Inc.*, No. 13 C 8316, 2014 WL 1884471 (N.D. Ill. May 12, 2014); *Fiers v. La Crosse County*, 132 F. Supp. 3d 1111 (W.D. Wis. 2015). We conclude, however, in keeping with the views of two of our sister circuits, that the court erred. See *Grammer v. John J. Kane Reg'l Centers-Glen Hazel*, 570 F.3d 520 (3d Cir. 2009); *Anderson v. Ghaly*, 930 F.3d 1066 (9th Cir. 2019); see generally *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) ("[T]he [section] 1983 remedy broadly encompasses violations of federal statutory as well as constitutional law."). We therefore reverse and remand for further proceedings.

## I

FNHRA establishes the minimum standards of care to which nursing-home facilities must adhere in order to receive federal funds in the Medicaid program, 42 U.S.C. § 1396 *et seq.* In addition to specifying rules for the facilities, it also includes "[r]equirements relating to residents' rights." *Id.* §§ 1395i-3(c); 1396r(c). This case involves two of those rights: the right to be free from chemical restraints imposed for purposes of discipline or convenience rather than treatment, see *id.* §§ 1395i-

No. 20-1644                                          3

3(c)(1)(A)(ii); 1396r(c)(1)(A)(ii); and the right not to be transferred or discharged unless certain criteria are met, see *id.* §§ 1395i-3(c)(2)(A), 1396r(c)(2)(A).

The Medicaid program "allows states to provide federally subsidized medical assistance to low-income individuals and families." *Bontrager v. Ind. Fam. & Soc. Servs. Admin.*, 697 F.3d 604, 605 (7th Cir. 2012); see 42 U.S.C. § 1396-1. Among other services, "medical assistance" includes treatment at nursing-home facilities. 42 U.S.C. § 1396d(a). In return for federal funding, participating states must comply with the program's statutory and regulatory requirements, including FNHRA. *Bontrager*, 697 F.3d at 606.

FNHRA was enacted pursuant to Congress's Spending Clause powers as part of the Omnibus Budget Reconciliation Act of 1987, codified at 42 U.S.C. §§ 1395i-3; 1396r. (The two sections are identical, and so from this point we will cite only to section 1396r.) It outlines several ways in which government-certified nursing facilities must avoid sub-standard care. The Act provides comprehensive guidance on the regulation and operation of nursing homes. Committee on Nursing Home Regulation, Institute of Medicine, *Improving the Quality of Care in Nursing Homes*, 2-3 (1986). See, *e.g.*, 42 U.S.C. § 1396r(a) (defining nursing facility); 42 U.S.C. § 1396r(b) (provision of services, performance reviews, and training expectations); 42 U.S.C. § 1396r(c) (requirements related to residents' rights, including a list of specified rights and accompanying notice requirements); 42 U.S.C. § 1396r(d) (requirements related to the administration of nursing home facilities); 42 U.S.C. § 1396r(e) (requirements for states related to nursing facility requirements, including a state appeals process for resident transfers and discharges); 42 U.S.C. § 1396r(f)

(responsibilities of the Secretary of Health and Human Services related to nursing facility requirements); 42 U.S.C. § 1396r(g) (instructions for states to conduct annual compliance surveys and associated certification processes); 42 U.S.C. § 1396r(h) (an enforcement scheme that authorizes states and the Secretary to take several remedial steps for noncompliant facilities); 42 U.S.C. § 1396r(i) (instructions to the Secretary for maintenance of a "Nursing Home Compare" website for Medicare beneficiaries).

Ivanka Talevski's complaint, brought on behalf of her disabled husband, accused Valparaiso Care of failing to adhere to FNHRA's requirements in numerous respects, including the following: failure to provide Gorgi Talevski with adequate medical care; the administration of powerful and unnecessary psychotropic medications for purposes of chemical restraint, the use of which resulted in Gorgi's rapid physical and cognitive decline; the discharge and transfer of Gorgi to other facilities in Indiana without the consent of his family or guardian, and without his dentures; the refusal to fulfill an administrative law judge's order to readmit him to Valparaiso Care; and the "maint[enance of] a policy, practice, or custom, [*sic*] that failed to care for Mr. Talevski in such a manner and in such an environment as to promote maintenance or enhancement of the quality of life of each resident."

On appeal, Ivanka has abandoned all but two of these particulars. Those that remain appear in sections 1395i-3(c) and 1396r(c) of the Act, "Requirements relating to residents' rights," known as the "Residents' Bill of Rights," H.R. Rep. No. 100–391, pt. 1, at 452. Ivanka alleges that Valparaiso Care violated Gorgi's statutory right to be free from chemical restraints by over-prescribing psychotropic drugs to restrain

No. 20-1644                                                      5

him chemically for purposes of discipline or convenience, 42 U.S.C. § 1396r(c)(1)(A)(ii), and his rights related to resident-transfer and discharge procedures, insofar as he was deprived of his rights to remain at Valparaiso Care and to receive timely notice of a transfer or discharge, 42 U.S.C. § 1396r(c)(2). We thus limit our inquiry to those two provisions.

Section 1396r(c)(1)(A) provides:

A nursing facility must protect and promote the *rights* of each resident, including each of the following *rights*: …

> (ii) Free from restraints
>
> The *right* to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints imposed for purposes of discipline or convenience and not required to treat the resident's medical symptoms. Restraints may only be imposed--
>
>> (I) to ensure the physical safety of the resident or other residents, and
>>
>> (II) only upon the written order of a physician that specifies the duration and circumstances under which the restraints are to be used (except in emergency circumstances specified by the Secretary until such an order could reasonably be obtained).

42 U.S.C. § 1396r(c)(1)(A)(ii) (emphasis added).

Section 1396r(c)(2) describes the circumstances in which a facility is permitted to transfer or discharge a resident. Facilities "must permit each resident to remain in the facility and

must not transfer or discharge the resident from the facility unless[:]"

> (i) the transfer or discharge is necessary to meet the resident's welfare and the resident's welfare cannot be met in the facility;

> (ii) the transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility;

> (iii) the safety of individuals in the facility is endangered;

> (iv) the health of individuals in the facility would otherwise be endangered;

> (v) the resident has failed, after reasonable and appropriate notice, to pay (or to have paid under this subchapter or subchapter XVIII on the resident's behalf) for a stay at the facility; or

> (vi) the facility ceases to operate.

Like section 1396r(c)(1)(A), this section focuses on the residents' rights; in substance it creates a right to remain in a facility in the absence of the specified justifications. It dictates pre-transfer and pre-discharge notice requirements and clinical record documentation. 42 U.S.C. § 1396r(c)(2)(A). As we indicated earlier, the question before us is whether sections 1396r(c)(1)(A)(ii) and 1396r(c)(2)(A) confer a privately enforceable right upon nursing home residents such as Talevski.

No. 20-1644                                                7

## II

### A

Several decisions of the Supreme Court provide the starting point for our analysis. In *Blessing v. Freestone*, 520 U.S. 329 (1997), and *Gonzaga University v. Doe*, 536 U.S. 273 (2002), the Supreme Court emphasized that plaintiffs seeking redress for an alleged violation of a statute through a section 1983 action "must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing*, 520 U.S. at 340 (emphasis in original). "Three factors help determine whether a federal statute creates private rights enforceable under § 1983." *Planned Parenthood of Ind., Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012).

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Blessing*, 520 U.S. at 340–41 (cleaned up). *Gonzaga* clarified that it is not enough for plaintiffs to fall "within the general zone of interest that the statute is intended to protect;" nothing "short of an unambiguously conferred right … phrased in terms of the persons benefited" can support a section 1983 action. 536 U.S. at 283–84. See also *Cannon v. Univ. of Chi.*, 441 U.S. 677, 692, n.13 (1979). *Gonzaga* further explained that courts must "determine whether Congress *intended to create a*

*federal right.*" 536 U.S. at 283 (emphasis in original). In applying *Blessing*'s three factors in light of *Gonzaga*, we must decide whether the text and structure of the relevant parts of FNHRA unambiguously reveal that it establishes individual rights for a particular class of beneficiaries. See *id.* at 286.

### B

We begin with the question whether Congress intended sections 1396r(c)(1)(A)(ii) and 1396r(c)(2)(A) to benefit nursing-home residents. We find that it did. Although other parts of section 1396r address measures that nursing homes must take, section (c) explicitly uses the language of rights. We do not know how Congress could have been any clearer. After the heading, the statute says "[a] skilled nursing facility *must protect and promote the rights of each resident, including each of the following rights.*" 42 U.S.C. § 1396r(c)(1)(A) (emphasis added). For this part of the statute, therefore, nursing-home residents are the expressly identified beneficiaries.[1] *Gonzaga*, 536 U.S. at 283. The facilities in which they reside "must protect and promote the right[] of each resident" to be free from chemical restraints, and "must permit each resident to remain in the facility and must not transfer or discharge the resident." See 42 U.S.C. §§ 1396r(c)(1)(A)(ii) and (c)(2). Congress's "unmistakable focus" on the entitlements of individual residents is apparent. *Cannon*, 441 U.S. at 691. And, to reiterate, both protections contain exactly the type of "rights-creating language" *Gonzaga* described as critical: they set forth "the *rights* of each resident" and appear under the "specified rights" heading of

---

[1] We do not have before us, and we make no comment on, the existence of a private right of action under any other provisions of FNHRA.

No. 20-1644                                                              9

42 U.S.C. § 1396r(c). *Gonzaga*, 536 U.S. at 284; see also *Alexander v. Sandoval*, 532 U.S. 275, 288–89 (2001).

Valparaiso Care argues that Ivanka cannot show the necessary individual focus because the protections at issue serve only as directives to nursing facilities and physicians, and FNHRA as a whole is addressed to states that receive federal Medicaid funding. But it is ignoring the language Congress chose in the sections on which Ivanka is relying. Congress told the facilities to respect the *rights* it had singled out, just as a facility must respect a person's right to be free from sex or race discrimination. It is thus of no consequence that section 1396r(c)(1)(A) begins with the phrase "[a] nursing facility must … ." What must it do? "[P]rotect and promote the rights of each resident … ."

Faced with similar language in *Anderson v. Ghaly*, the Ninth Circuit found an unambiguous conferral of individual rights. 930 F.3d 1066, 1074–75 (9th Cir. 2019). The statute it was evaluating, 42 U.S.C. § 1396r(e)(3), requires states to "provide for a fair mechanism … for hearing appeals on transfers and discharges." The court rejected the argument that "a statute cannot create rights when phrased as a directive to the state," *id.* at 1074, and held instead that the rights-creating language of the statute was what mattered. *Id.* The fact that "cooperative federalism programs like Medicaid, under which 'Congress provides funds to the states on the condition that the state spend the funds in accordance with federal priorities,' are necessarily phrased as a set of directives to states that wish to receive federal funding," *id.* (citation omitted), was of no moment.

Congress enacted FNHRA as an amendment to the Medicaid statute in response to widespread abuses among

government-certified nursing facilities. Nursing facilities have an important role to play in ending that abuse. Contrary to Valparaiso Care's argument that the acknowledgement of the role of the nursing facilities must mean that the statute only tangentially touches on the rights of residents, however, we find dispositive the fact that Congress spoke of resident *rights*, not merely steps that the facilities were required to take. This shows an intent to benefit nursing home residents directly. As the Ninth Circuit put it in *Anderson*, "[i]t has never been a requirement that a statute focus *solely* on individuals, to the exclusion of all others, to demonstrate congressional intent to create a statutory right." *Id*. (emphasis in original). If it were, "plaintiffs [would be] now flatly forbidden in section 1983 actions to rely on a statute passed pursuant to Congress's Spending Clause powers." *BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d 815, 820–21 (7th Cir. 2017). But that is not the law. Indeed, the Supreme Court has cautioned against such a blunt approach in favor of a "methodical inquiry" into the plaintiff's claims. See *Blessing*, 520 U.S. at 342–43.

*Blessing*'s second factor requires the plaintiff to demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence. Sections 1396r(c)(1)(A)(ii) and 1396r(c)(2)(A) do not suffer from those flaws. The rights they protect "fall[] comfortably within the judiciary's core interpretive competence." *Planned Parenthood of Ind., Inc.*, 699 F.3d at 974. Facilities "must not" do exactly what Ivanka alleged has occurred: subject residents to chemical restraints for purposes of discipline or convenience and involuntarily transfer or discharge any resident absent one of several allowable justifications and notice. It does not take a medical review board to determine whether these rights have been violated.

No. 20-1644                                              11

Valparaiso Care's arguments to the contrary are unconvincing. Clinging to FNHRA's use of the undefined words "protect," "promote," "discipline," and "convenience" in section 1396r(c)(1)(A), it asks how a court could determine whether a nursing facility has sufficiently protected and promoted freedom from chemical restraints or assess whether a decision to use restraints falls under an acceptable exception. Similarly, it doubts a court's ability to assess whether a transfer or discharge decision falls into one of the six enumerated circumstances under section 1396r(c)(2)(A). But these are focused, straightforward inquiries that agencies and courts are well equipped to resolve. It is worth noting that there is no evidence of this kind of hand-wringing in the administrative law judge's decision rejecting Valparaiso Care's transfer decision.

Finally, there is no dispute that plaintiffs meet *Blessing*'s third factor, which asks whether the provision giving rise to the asserted right is couched in mandatory rather than precatory terms. Facilities *must* protect and promote the right against chemical restraints, *must* allow residents to remain in the facility, *must* not transfer, and *must* not discharge the resident; these are unambiguous obligations. Ivanka points to this language to show that "the meaning of the statute's terms is plain" and our job is over. See *Bostock v. Clayton County*, 140 S. Ct. 1731, 1749 (2020). We agree with her that a commonsense reading of its provisions leaves no room for disagreement.

In sum, we find that sections 1396r(c)(1)(A)(ii) and 1396r(c)(2)(A) unambiguously confer individually enforceable rights on nursing-home residents such as Gorgi Talevski.

## C

Once a plaintiff satisfies the *Blessing* criteria, the right is presumptively enforceable under section 1983. A defendant may rebut this presumption only by "showing that Congress specifically foreclosed a remedy under § 1983 … expressly, through specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983[.]" *Gonzaga*, 536 U.S. at 284 n.4 (cleaned up). The express route is not available here, as FNHRA does not contain any such language. We thus confine ourselves to rebuttal by implication.

Valparaiso Care argues that FNHRA impliedly forecloses section 1983 claims because it provides federal and state enforcement schemes in addition to individualized mechanisms for recourse other than section 1983. In support, it cites section 1396r(g)(2)(A), which is entitled "Annual standard survey." Under that provision, each nursing facility is subject to an annual, unannounced survey conducted by the state. If the survey reveals that a nursing facility is out of compliance with the rest of the statute, including the residents' bill of rights, the state has several options. It can terminate the facility's participation in the state's Medicaid plan; deny payment to the facility; assess a civil monetary penalty; appoint temporary managers; close the facility; transfer residents; or take some combination of these measures. *See* 42 U.S.C. §§ 1396r(h)(2)(A)(i)–(iv). The statute gives the Secretary of Health and Human Services the same authority and duties as a state and provides rules for situations "where State and Secretary do not agree on [a] finding of noncompliance." 42 U.S.C. § 1396r(h)(3)(A); *id.* at § 1396r(h)(6). Valparaiso Care also draws our attention to 42 U.S.C. § 1396r(e)(3), which says

No. 20-1644                                                                13

that "State[s] … must provide a fair mechanism…for hearing appeals on transfers and discharges of residents," and 42 U.S.C. § 1396r(c)(1)(A)(vi), which requires nursing facilities to protect and promote the rights of each resident "to voice grievances with respect to treatment or care that is (or fails to be) furnished … and the right to prompt efforts by the facility to resolve grievances the resident may have."

This is not the type of comprehensive enforcement scheme, incompatible with individual enforcement, that we are looking for. "The provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983." *Planned Parenthood of Ind., Inc.*, 699 F.3d at 975 (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005)). Valparaiso Care has not identified anything close to the type of "unusually elaborate, carefully tailored, and restrictive enforcement schemes" that section 1983 claims would frustrate. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009) (cleaned up). Nursing-home residents are free to file a complaint or grievance with the nursing facility and state survey and certification agents. But regulatory surveys and any accompanying enforcement processes are designed only to ensure facilities' compliance with FNHRA's various standards. They do not address, and thus do not protect, individual entitlements to be free from chemical restraints or involuntary transfer or discharge. The administrative appeals process for involuntary transfers does not indicate a comprehensive enforcement scheme either. "[A] plaintiff's ability to invoke § 1983 cannot be defeated simply by 'the availability of administrative mechanisms to protect the plaintiff's interests.'" *Blessing*, 520 U.S. at 347 (quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989)).

The Supreme Court has found that a statutory scheme implicitly forecloses section 1983 liability in only three cases. See *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981) (comprehensive enforcement mechanisms included citizen-suit provisions); *Smith v. Robinson*, 468 U.S. 992 (1984) (statute afforded rights holders state hearings, detailed procedural safeguards, and judicial review); and *City of Rancho Palos Verdes*, 544 U.S. 113 (statute provided an express, private means of redress in the statute itself). It has never flatly ruled out private actions under statutes passed pursuant to Congress's Spending Clause powers. See *BT Bourbonnais Care*, 866 F.3d at 820–21.

Valparaiso Care and its fellow defendants have not shown that, despite the express rights-creating language in the statute we are considering, there is no private action here. Were there any lingering doubt, it should be put to rest in the general guidance provided in section 1396r(h)(8): "The remedies provided under this subsection are in addition to those otherwise available under State or Federal law and shall not be construed as limiting such other remedies, including any remedy available to an individual at common law." Defendants read this clause to protect only existing state law, but the text has no such limitation, and in fact specifically mentions federal law. That means all federal law; there is nothing that supports carving out section 1983, and we will not rewrite the statute to create any such exception.

### III

Valparaiso Care makes an additional argument that the district court did not reach in favor of dismissal: it contends that both of Ivanka's claims are too late. It is worth recalling, in this connection, that the proper way to raise a limitations

No. 20-1644                                          15

defense is in the answer, as an affirmative defense. See FED. R. CIV. P. 8(c), bullet 17. If the pertinent facts are undisputed or can be taken favorably to the nonmoving party, the defendant may move for judgment on the pleadings. See FED. R. CIV. P. 12(c). Occasionally (perhaps all too often) both parties and courts short-circuit this process and permit a limitations defense to be raised in a motion under Rule 12(b)(6), if the complaint alone alleges enough facts to eliminate all doubt about timeliness. See, *e.g.*, *Amin Ijbara Equity Corp. v. Village of Oak Lawn*, 860 F.3d 489, 492 (7th Cir. 2017). The latter qualification is critical, however, and it highlights what is missing in this case.

Section 1983 claims do not have a built-in statute of limitations; instead, they borrow state statutes of limitations and tolling rules for general personal injury actions. *Wilson v. Garcia*, 471 U.S. 261, 275 (1985); see *Dixon v. Chrans*, 986 F.2d 201, 203–04 (7th Cir. 1993). In Indiana, the pertinent statute of limitations is two years. See *Devbrow v. Kalu*, 705 F.3d 765, 767 (7th Cir. 2013); Ind. Code Ann. § 34-11-2-4. A brief timeline of events is helpful here to understanding the dispute in this case.

Gorgi began his stint at Valparaiso Care in January 2016. Around August of that same year, his daughter observed the rapid deterioration of her father's cognitive and physical abilities; he could no longer feed himself and lost the ability to speak English, though he could still speak his mother tongue, Macedonian. Skeptical of Valparaiso Care's insistence that any change in her father's condition could be traced to the natural advancement of dementia, Talevski's daughter requested a list of her father's medications in September 2016. The list she received showed ten medications, six of which

were identified as powerful psychotropic drugs—that is, drugs capable of affecting the chemical composition of the brain. The family hired a private neurologist, who had the drugs removed. Around the same time, the Indiana Department of Health conducted its "annual standard survey" of the facility. 42 U.S.C. § 1396r(g)(2)(A). The Talevskis filed a formal complaint during the week of September 27, 2016. Before the end of the year, Valparaiso Care began trying to transfer Talevski to a facility over an hour away. It made several efforts: initially between November 23, 2016, and December 15, 2016; then December 19, 2016, and December 29, 2016; and finally, December 30, 2016, and January 9, 2017.

At this point, Valparaiso Care tried to discharge Talevski involuntarily to an all-male dementia facility two-and-a-half hours away in Indianapolis. The Talevskis filed a petition for review of the transfer decision with the ISDH while Talevski moved to yet another facility an hour away. See 42 U.S.C. § 1396r(e)(3). An administrative law judge eventually rejected Valparaiso Care's transfer efforts, but Talevski never returned to Valparaiso Care. Ivanka Talevski filed the complaint in this case on January 20, 2019.

Valparaiso Care argues that Talevski's chemical-restraint claim accrued in September 2016 when the Talevski family received a list of medications that confirmed the use of chemical restraints. The complaint does not specify when the facility stopped using the medications. But Valparaiso Care reasons that the claim most likely accrued in September 2016, or perhaps as late as November 23, 2016, when Valparaiso Care began the transfer process. At the very latest, it contends, the claim accrued on December 30, 2016, the last time Gorgi was at the facility and more than two years before the filing of the

No. 20-1644                                                        17

complaint. As for the transfer claim, Valparaiso Care trans-
ferred Talevski on December 30, 2016, and refused to readmit
him on January 9, 2017, making one of those two dates the
likely date of accrual. Both dates fall more than two years be-
fore the complaint.

Ivanka responds that Gorgi's claims are not time barred
because the statute of limitations was tolled as a result of his
legal disability. Indiana law states that "[a] person who is un-
der legal disabilities when the cause of action accrues may
bring the action within two (2) years after the disability is re-
moved." Ind. Code Ann. § 34-11-6-1. Indiana defines "Under
legal disability" to include "persons less than eighteen (18)
years of age, mentally incompetent, or out of the United
States." Ind. Code Ann. § 1-1-4-5 (12) & (24). Gorgi Talevski
may be considered incapacitated under Indiana's Constitu-
tion because of his dementia. If he is, there is no statute of lim-
itations issue.

Looking to *Dixon v. Chrans*, 986 F.2d 201 (7th Cir. 1993),
Valparaiso Care contends that tolling should not take place
here. *Dixon* dealt with Illinois's legal disability tolling provi-
sion. That law differentiated among various types of disabili-
ties: for suits brought by incarcerated persons under section
1983 against officials or employees of the Illinois Department
of Corrections, there was no tolling; suits against other de-
fendants were tolled. The plaintiff in that case was incarcer-
ated and sued IDOC officials under section 1983. He did not
get the benefit of tolling. We concluded that absent a "tolling
rule designed *specifically* for general personal injury claims …
the process of deciding which state tolling rule to apply in-
volves the straightforward application of the rules as writ-
ten." *Id*. at 204 (emphasis in original).

This case is not like *Dixon* because Indiana has only one tolling rule for personal injury actions. But Valparaiso Care asks that we apply an exception to the legal-disability tolling provision because Indiana's Medical Malpractice Act contains an exception to that rule:

> A claim, whether in contract or tort, may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect[.]

Ind. Code Ann. § 34-18-7-1(b). This provision applies without regard to legal disability. *Id.* at § 34-18-7-1(a).

The problem with this argument is that a section 1983 action is not a medical malpractice action. It is analogous to a personal-injury claim. It is well established that "the characterization of civil rights statutes for limitations purposes is a federal question." *Allen v. Hinchman*, 20 N.E.3d 863, 873 (Ind. Ct. App. 2014). The Supreme Court has spoken, and section 1983 claims are "best characterized as personal injury actions." *Dixon*, 986 F.3d at 203 (citing *Wilson v. Garcia, supra,* 471 U.S. 261).

This makes sense. The choice of a limitations period cannot depend on the facts of a plaintiff's specific circumstances. See *Allen*, 20 N.E.3d at 873 (quoting *Garcia*, 471 U.S. at 274) ("[I]f the choice of the statute of limitations were to depend upon the particular fact or the precise legal theory of each claim, counsel would almost always argue, with considerable force, that two or more periods of limitations should apply to each § 1983 claim[.]"). Moreover, assuming for present

No. 20-1644                                                                19

purposes that the legal disability tolling exception is at issue, there is no record from the district court to determine whether the doctors who administered six chemical restraints to Talevski did so "based upon professional services of health care that was provided" rather than for reasons of convenience or restraint. The proper course at this point is for the district court to develop the record and rule accordingly.

## IV

In a last-ditch effort to circumvent *Blessing*, Valparaiso Care argues that our recent decision in *Nasello v. Eagleson*, 977 F.3d 599 (7th Cir. 2020), indicates an unwillingness to find enforceable private rights in statutes passed pursuant to Congress's powers under the Spending Clause. There we found that a provision of the Medicaid Act that requires states to count earlier medical expenses not covered by third parties when calculating a "medically needy" persons' income "sets conditions on states' participation in a program, rather than create direct private rights" and that plaintiffs' other claim fell outside of the scope of the provision they invoked. *Id*. at 601–02. We also observed that since *Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990), the Supreme Court has "repeatedly declined to create private rights of action under statutes that set conditions on federal funding of state programs," *Nasello*, 977 F.3d at 601.

It has indeed been more than 30 years since *Wilder*, and we realize that the Supreme Court itself has not recognized new Spending Clause-based private rights of action during that period. But it is just as true that the Court has never disapproved *Wilder*. As a careful look at its decisions shows, it has instead insisted on a high bar for these private rights of action,

and it has found that the parties in the cases before it have not cleared that bar.

*Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), illustrates this point well. It dealt with section 340B of the Public Health Services Act, 42 U.S.C. § 256b, which imposes ceilings on the prices that drug manufacturers may charge to public and community health centers. The price ceilings are enforced through Pharmaceutical Pricing Agreements between the drug manufacturers and a unit of the Department of Health and Human Services (HHS). The suit was brought by the health centers (called 340B entities) against manufacturers for alleged overcharges. Notably, the centers conceded that they had no private right of action under the statute to bring a direct action against the manufacturers. *Id.* at 113. But they argued nonetheless that the statute permitted them to sue the manufacturers as third-party beneficiaries of the Agreements. Not so fast, said the Court: "[i]f 340B entities may not sue under the statute, it would make scant sense to allow them to sue on a form contract implementing the statute … ." *Id.* at 114. Since the recognition of a private right of action for violating a federal statute is proper only if Congress intended to provide a private remedy, *id.* at 117, and Congress did no such thing in the relevant statute, plaintiffs were out of luck.

Another case that touches on this issue is *Sossamon v. Texas*, 563 U.S. 277 (2011). It relies on the uncontroversial rule that it is ultimately Congress that controls whether a private right of action should be recognized in legislation that rests to some extent on the Spending Clause. In fact, the central issue in *Sossamon* was tangential to our inquiry. The question was whether a state, by accepting federal funds, automatically

No. 20-1644                                                    21

consents to waive its sovereign immunity to suits for money damages under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc *et seq. Id.* at 280. For reasons irrelevant to our case, Congress had relied on its Spending and Commerce Clause powers when it passed RLUIPA. The statute included an express private right of action against various governmental entities, including states. See 42 U.S.C. § 2000cc-2(a). Noting that the test for finding a waiver of sovereign immunity is "a stringent one," 563 U.S. at 284, and that "[a] State's consent to suit must be unequivocally expressed in the text of the relevant statute," *id.* (quotations omitted), the Court found that the mere act of accepting federal funds was not adequate to serve as a waiver of sovereign immunity. The fact that RLUIPA rested in part on the Spending Clause made no difference. As the Court put it:

> It would be bizarre to create an "unequivocal statement" rule and then find that every Spending Clause enactment, no matter what its text, satisfies that rule because it includes unexpressed, implied remedies against the States. The requirement of a clear statement in the text of the statute ensures that Congress has specifically considered state sovereign immunity and has intentionally legislated on the matter.

*Id.* at 290.

The third case in this line is *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015). Its facts are closer to our case than those of the other two, insofar as it involved an effort to enforce certain aspects of the Medicaid program. The Court put the question presented succinctly, as "whether Medicaid providers can sue to enforce § (30)(A) of the Medicaid Act." *Id.* at 322. That section requires a state plan to include the

provision of certain in-home care services for eligible people. Relying on the theory that they had an implied private right of action under the Supremacy Clause of the Constitution, Art. VI, cl. 2, the providers of those services filed a suit in which they argued that Idaho's reimbursement rates were too low to support the required level of services.

The Supreme Court held that the premise of the suit was wrong—the Supremacy Clause does not support a private right of action whenever someone asserts that state law conflicts with a federal mandate. The Court then addressed the question whether the providers could base their right of action directly in section 30(A) of the Act. It also answered this in the negative. Critically, it found that section 30(A)'s text was "judicially unadministrable," *id.* at 328, and that by providing an express administrative remedy, the Act precluded private enforcement. Finally, the Court rejected the idea that the Medicaid Act itself provided a private right of action to the providers, because "[s]ection 30(A) lacks the sort of rights-creating language needed to imply a private right of action." *Id.* at 331. It is phrased, the Court pointed out, as a directive to the federal agency, "not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate in Medicaid." *Id.*

*Armstrong* thus confirms the inquiry we must make to see if a different part of the Medicaid Act, in a suit brought by different parties, can support a private right of action: do we have the necessary rights-creating language to support a private right of action? The Court could have saved itself a great deal of time if it had wanted to establish an unbending rule that Spending Clause legislation *never* supports a private action. It did not do so in *Armstrong*, and it did not even hint

No. 20-1644                                                              23

that it was overruling *Wilder.* In keeping with that guidance, neither we nor other courts have found any such categorical rule. See, *e.g.*, *Bontrager,* 697 F.3d at 607 (section 1396a(a)(10) satisfies *Wilder* and permits private right of action enforceable through section 1983) (alterations in original); *Planned Parenthood of Ind., Inc.,* 699 F.3d at 974 (private right of action under section 1396a(a)(23), which says that "all state Medicaid plans provide that 'any individual eligible for medical assistance ... may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required'"); *BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d at 817 (private right of action under section 1396a(a)(13)(A), which says "[a] State plan for medical assistance must … provide … for a public process for determination of rates of payment under the plan for ... nursing facility services").

Our sister courts have agreed that FNHRA confers such rights. See *Grammer v. John J. Kane Reg'l Centers-Glen Hazel*, 570 F.3d 520, 524–25, 527 (3d Cir. 2009); *Anderson v. Ghaly*, 930 F.3d 1066, 1074 (9th Cir. 2019); *cf. Concourse Rehabilitation & Nursing Center Inc. v. Whalen*, 249 F.3d 136 (2d Cir. 2001) (section 1396r(b)(4)(A) "is obviously intended to benefit Medicaid beneficiaries" and thus does not entitle health care providers to bring suit under section 1983). *Nasello* reflects the caution with which we approach finding an enforceable private right of action, but, as *Armstrong* clarified, the position of providers is different from that of recipients, and it is critical in our case that the statute itself contains the necessary rights-creating language for the recipients.

24                                          No. 20-1644

*      *      *

We therefore hold that it was error to dismiss this case for failure to state a claim. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.